1                 IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF WYOMING

3    --------------------------------------------------------------

4    UNITED STATES OF AMERICA,

5           Plaintiff,                    Case No. 10-CR-329-F

6           vs.                           Cheyenne, Wyoming
                                          February 6, 2012
7    JOHN MICHAEL MORGAN,                 4:00 p.m.

8           Defendant.

9    --------------------------------------------------------------

10
                   TRANSCRIPT OF SENTENCING PROCEEDINGS
11
              BEFORE THE HONORABLE NANCY D. FREUDENTHAL
12                 CHIEF UNITED STATES DISTRICT JUDGE

13   APPEARANCES:
     For the Plaintiff:      MR. L. ROBERT MURRAY
14                           Assistant United States Attorney
                             UNITED STATES ATTORNEY'S OFFICE
15                           District of Wyoming
                             2120 Capitol Avenue, Room 4000
16                           P.O. Box 668
                             Cheyenne, Wyoming 82003
17

18   For the Defendant:      MR. NICK E. BEDUHN
                             Attorney at Law
19                           GOPPERT, SMITH & BEDUHN
                             1309 Sheridan Avenue
20                           P.O. Box 880
                             Cody, Wyoming  82414-0880
21

22   Court Reporter:         MRS. JANET DAVIS, RMR, FCRR
                             United States Court Reporter
23                           2120 Capitol Avenue, Room 2228
                             Cheyenne, Wyoming  82001
24
     Proceedings recorded by mechanical stenography, transcript
25   produced with computer.

1                    P R O C E E D I N G S

2        (Sentencing proceedings commenced

3        4:00 p.m., February 6, 2012.)

4             THE CLERK:  In criminal matter Case No. 10-CR-329-6-F,

5    United States of America versus John Michael Morgan, set today

6    for sentencing.

7        Counsel, please state your appearances.

8             MR. MURRAY:  Bob Murray for the United States.

9             MR. BEDUHN:  Nick Beduhn for John Morgan, Your Honor.

10            THE COURT:  Good afternoon.  Mr. Beduhn, have you and

11   Mr. Morgan read and discussed the Presentence Report?

12            MR. BEDUHN:  Yes, we have.

13            THE COURT:  And I apologize if we've covered some

14   ground we covered before recess, but given the fact that I'm

15   not particularly clear how far we got through the process, I

16   will cover that same ground again.

17            Are there any factual issues concerning the

18   Presentence Report?

19            MR. BEDUHN:  No, Your Honor, there are not.

20            THE COURT:  Are there any factual issues from the

21   Government's perspective?

22            MR. MURRAY:  No, Your Honor.

23            THE COURT:  All right.  The Court, then, will adopt

24   the Presentence Report as its findings of fact.

25            Are there legal issues relevant to the guideline

1    calculations?  And then after we get through the guideline

2    calculations, we will deal with departure or variance requests.

3          MR. BEDUHN:  No, Your Honor, there is not on behalf of

4    Mr. Morgan.

5          THE COURT:  Anything from the Government?

6          MR. MURRAY:  No, Your Honor.

7          THE COURT:  All right.  We are here for sentencing for

8    a base offense level for violation of the drug trafficking

9    laws.  The Court does note -- let me get my documents in

10   order -- the plea agreement where the stipulated relevant

11   conduct is at least 1 and a half kilograms but less than 5

12   kilograms of a mixture or substance of methamphetamine.

13         The Court, having sat through the trial in this matter

14   and being familiar with the relevant conduct computed for

15   Mr. Ordaz, Mr. Garcia and Mr. Renteria in terms of where

16   they -- their base offense level started, after an independent

17   investigation by Probation, those three gentlemen were assigned

18   initially a base offense level of 32.

19         And at this time, considering that and to avoid

20   unwarranted sentencing disparity, the Court will modify the

21   base offense level from a level 34 to a level 32,

22   notwithstanding the stipulated relevant conduct in the plea

23   agreement.

24         Therefore, we're at an adjusted offense level of 32

25   with a three-level reduction for timely acceptance of

1    responsibility and for this defendant's assistance in the

2    investigation and prosecution of his own conduct, the Court

3    will grant a three-level reduction for -- under 3(E)1.1

4    arriving at a total offense level of 29.

5         There are no Chapter 4 enhancements applicable in this

6    case.

7         The defendant's criminal history dates back to age 18

8    and age 19.  He has two one-point convictions.  He, however,

9    was on probation when he committed the current offense or the

10   offense that we're here to address, and so two points are added

11   under the sentencing guidelines for a total of four criminal

12   history points which establishes him at a Criminal History

13   Category III.

14        I want to turn back to Counsel, given that the Court

15   did make an adjustment to the base offense level, to afford

16   Counsel an opportunity to put objections or argument on the

17   record before I adopt the guideline calculations.

18        For the Government.

19        MR. MURRAY:  Yes, Your Honor.  I think ultimately it

20   is really not going to matter because of the Government's

21   recent filing of the substantial assistance motion; however,

22   with regard to the quantity calculation and stipulation in the

23   plea agreement, just wanted to point out for the Court, and it

24   is included in the Presentence Report, is that there are

25   quantities for which this defendant is responsible for after he

1    had finished his conspiracy with the Velasquez group,

2    Mr. Ordaz.

3          The defendant, after being supplied methamphetamine

4    from the Velasquez group, engaged in the second conspiracy for

5    which I think he -- I don't know that he was charged, but he

6    accepted responsibility for the additional quantity in that

7    case, which would be the difference between the underlying

8    Ordaz-Renteria case where the calculation was just under 1 and

9    a half kilos, whereas here, including that additional amount as

10   the parties stipulated to, would be over 1 and a half kilos.

11         Like I say, I don't know that that really matters

12   ultimately because the Court can consider reducing the total

13   offense level based upon the Government's motion for

14   substantial assistance.

15         THE COURT:  Ms. Danni, I don't believe I visited with

16   you concerning this issue.  I wanted to gain your observations

17   as well after looking -- for some reason, maybe it was just the

18   Prosecutor's Statement and my focus on the Velasquez

19   conspiracy.  I do recollect the testimony at trial where after

20   Robert was in jail, I believe it was, Mr. Morgan turned to

21   another source.  But for some reason I still thought that was

22   wrapped up with or imputed to this instant conspiracy.  I do

23   want to arrive at the correct relevant conduct.

24         THE PROBATION OFFICER:  First of all, I would say when

25   I first calculated John Michael Morgan's relevant conduct, it

1    far preceded the trial, the Velasquez, et al., trial.  And a

2    lot of the relevant conduct that I placed on him at that time I

3    didn't have a specific quantity, and so a lot of it was based

4    on reasonable foreseeability.

5         So now if I were to look at him like I looked at the

6    others that came after him and gave him what was reasonably

7    foreseeable now with all of the information we have, I would

8    have placed him at the same relevant conduct, and I believe

9    that's 1.143 kilograms.

10        Now, if we were to add what he went out and did after

11   Mr. Velasquez was confined for his aggravated assault and in --

12   his drug trafficking continued, that was a different conspiracy

13   and in visiting with some of the other officers and looking at

14   what had happened in that trial -- or in that conspiracy, I

15   think what we had concluded, that it was approximately 4 to 5

16   ounces.

17        Now, I wouldn't say that's absolutely true.  I

18   wouldn't bet my life on it.  Even if we were to add that

19   quantity, it wouldn't push him over the 1.5.

20        Now, at the time that I looked at him, I thought it

21   was reasonably foreseeable, the 1.5 to 5.  Now if I had looked

22   at him at a different time, I think I would have had a more

23   accurate figure.  Now -- and I think Mr. Murray is correct, I

24   think it is -- putting him to a level 32 I think it is somewhat

25   semantics because at a level 29, Criminal History Category III,

1   I believe his guideline range, the mandatory minimum would

2   still dictate and I think he would be 120 to 135.  And so he's

3   still at the 180 months with a consecutive 924(c).

4        So I would have to tell the Court I think what I did

5   at the time is accurate.  If the Court feels a revision on the

6   relevant conduct is necessary, I completely understand that.

7   And I would be happy to answer any other questions.

8        THE COURT:  Well, I guess I thought I heard you say

9   that had you done this after trial more in -- at a time more --

10       THE PROBATION OFFICER:  Proximal to the other

11  defendants.

12       THE COURT:  Yeah, proximal to the other defendants

13  that you would assign him a level 32 for relevant conduct.

14       THE PROBATION OFFICER:  Yeah, I think I because we had

15  more information, given the wiretaps and the wire transfers,

16  and when that money trail ended, and as a group we decided to

17  take a more conservative approach and cap it at the 40 ounces

18  and that sort of a thing.

19       Is it altogether possible?  And I think I even said in

20  my response to Mr. Fun when he objected to the calculation I

21  had made and that the other probation officer made relative to

22  the codefendants that is it likely that that drug trafficking

23  conspiracy continued?  We believe that the Government wouldn't

24  be wrong in saying that yes, it maybe did.  But we don't have

25  anything tangible to hang figures on that stands -- and that's

1   true for the cutting of the drugs as well.  Did they probably

2   cut that substance?  Yeah, they probably did.  How much, to

3   what degree and how often, we just can't say with any

4   certainty.  So therein lies the conflict.

5          THE COURT:  All right.

6          THE PROBATION OFFICER:  And the inconsistency -- and I

7   hope that clarifies it for the Court, and I will answer any

8   other questions you might have.

9          THE COURT:  I don't think so.  Thank you.

10          Mr. Beduhn.

11          MR. BEDUHN:  Your Honor, the other thing I would like

12   to state is that we wouldn't object to the relevant conduct as

13   calculated by the Court.

14          THE COURT:  Thank you.  Noting the Government's

15   concerns about reducing the relevant conduct, I remain of the

16   opinion that the best evidence in support of relevant conduct

17   for this defendant's direct involvement as well as what is

18   reasonably foreseeable to him through the scope of this

19   conspiracy is better pegged to a level 32.

20          And so I will -- those, then, will be the Court's

21   conclusions on the guideline calculation.  Again, to summarize

22   would be at a total offense level of 29 and a criminal history

23   of III.

24          I did see the filing today of the Government's motion.

25   Why don't we take that next where we move to the area of either

1    departure or variance arguments?

2         Mr. Murray, if you would like to address the Court.

3         MR. MURRAY:  Yes, Your Honor, with regard to the

4    defendant's advisory guideline calculations, they really at

5    this point -- they don't matter because the defendant faces a

6    10-year mandatory minimum on the drug offense and a consecutive

7    5-year mandatory minimum on the gun offense.  So

8    notwithstanding the advisory guidelines or the quantity

9    calculations, the defendant's offense level would become under

10   the guidelines 120 months and above.  So -- or 180 months and

11   above.

12        When you look at the plea agreement in this case --

13   and I was not involved in the plea negotiations nor am I

14   signator to the plea agreement.  However, taking a look at this

15   plea agreement, it is -- it contains an agreement on sentencing

16   and substantial assistance that is unconventional to the

17   office's usual practice, and I believe we arrived at that

18   negotiated plea agreement largely intending a 15-year sentence

19   because we were agreeing to dismiss a consecutive stacked

20   924(c) which is an additional 25 years incarceration.

21        So looking at the spirit of the agreement, it to me

22   appeared the parties intended to have this defendant sentenced

23   to 15 years, the mandatory minimum calculations.

24        Now, I guess getting back to the relevant conduct, the

25   stipulation actually helps the Government's motion because with

1    the calculation at the high end of 168 months as calculated by

2    Ms. Danni, you then add to that the 60 months which is not

3    taken into account, and you arrive at a guideline calculation

4    or a range that would be somewhere around 228 months which is

5    significantly higher than the 180 months, or 15 years, intended

6    by the plea agreement.

7           And so in good faith I believe it necessary to file

8    this motion, request that the Court, in addition to his

9    substantial assistance that avoided the stacked 924(c), to

10   reduce his guideline calculation to a range that would allow

11   the Court to sentence the defendant at the 15-year intended

12   mark.  And we have done that.  I added the additional levels to

13   35, I believe came down three to 32, and then within that range

14   you can sentence the defendant at a 15-year minimum mandatory

15   and that's where the minimum mandatory would stick.

16          So with that said, the Government acknowledges as well

17   that in order to get from 228 months down to 180 months, we

18   open the door for a nonminimum mandatory sentencing by this

19   Court, which we acknowledge that the effect of our motion is

20   opening the door to a discretionary departure down from the

21   15-year minimum mandatories.  That under the case law is the

22   only grounds for a departure that the Court can make at this

23   point, not the 3553(a) factors or other guideline factors, but

24   taking into account the defendant's substantial assistance does

25   the Court believe that this defendant deserves a departure

1   further than what the Government at this point has agreed to

2   make in its motion.  And that we will leave to the Court's

3   discretion.

4           As the Court is aware, we have a plea agreement where

5   we intended the defendant to receive a 15-year sentence.  He

6   testified with regard to that fact at the trial of his

7   codefendants, and to accomplish that, we filed the motion.

8           THE COURT:  Thank you.  Is there anything -- any

9   response by the defendant on the Government's substantial

10  assistance motion?

11          MR. BEDUHN:  No, Your Honor.  We are just thankful

12  that the Government decided to file the motion.

13          THE COURT:  All right.  The Court will grant the

14  Government's substantial assistance motion within the context

15  of that motion as well as recognized in the plea agreement.

16  The defendant does have the right to request that the Court

17  depart further than what the Government recommends which was

18  the 180-month sentence that the Government seemed to

19  anticipate, and I believe that I recall Mr. Morgan recognized

20  that as well in the context of his testimony.

21          So the Court will grant the Government's substantial

22  assistance motion.

23          And, Mr. Beduhn, do you have additional argument for

24  the appropriate disposition of this?

25          MR. BEDUHN:  Yes, Your Honor.

1          THE COURT:  If you would like to proceed.

2          MR. BEDUHN:  Thank you, Your Honor, may it please the

3   Court, Mr. Murray.  Your Honor, we were previously here in

4   December for the sentencing, and at that point I believe that's

5   when the Court asked or inquired from myself and my client,

6   Mr. Morgan, whether or not we would like the Court to reject

7   the plea agreement, which kind of led us here two months later.

8          Prior to that hearing on behalf of Mr. Morgan, I did

9   file a sentencing memorandum that was asking for a downward

10  departure away from the mandatory minimums and the Court as

11  well as myself recognized that the law might not be there.

12  But, however, with the Government filing this motion, the 5K

13  motion pursuant to Rule 5K1.1 and 3553(e), the Court now has

14  discretion.

15         I think it is important to note that the Court, who

16  has sat through the four and a half week trial, had the

17  opportunity to listen to Mr. Morgan's testimony for a day and a

18  half, put through a rigorous cross-examination by multiple

19  defense attorneys, that the Court is in the prime position to

20  use its discretion to sentence Mr. Morgan to what she believes

21  is appropriate.

22         Your Honor, I'm not going to rehash what I wrote in

23  the sentencing memorandums nor all the character letters that

24  came in in support.  I know based off our last hearing in

25  December that the Court is well aware of what we are arguing.

1   I would just like to highlight a few of the things why we

2   believe Mr. Morgan has provided superior acceptance of

3   responsibility which leads to substantial assistance with the

4   Government.

5           When Mr. Morgan was originally arrested back in

6   September with the search warrant to his house and even prior

7   to the months up to that, Mr. Morgan was in contact with the

8   Department of Criminal Investigation, actually went as far as

9   signing off on a confidential informant agreement.  He

10  continued to have contact with Special Agent Mike Hall up

11  through the search warrant.

12          Once the search warrant was executed, up through that

13  point in time he actually started speaking with law

14  enforcement.  I would note other than Ms. Perkins in this case

15  who was wearing a wire over in Sheridan County, Mr. Morgan was

16  the first defendant to step up to the plate and proffer

17  testimony.  He did that in January of 2011 with the

18  Department -- Drug Enforcement Agency as well as several

19  officers from the Division of Criminal Investigation as well as

20  myself and Mr. Blythe.  But that all took place in January of

21  2011.

22          Shortly after that, to provide greater assistance,

23  through the course of that and when he was in Scottsbluff,

24  Nebraska, he was also able to pass on more information to

25  myself that I was able to share with Mr. Fun in regards to the

1    codefendants.  We sat at length in Casper, Wyoming, for a full

2    day also in trial preparation in the late spring of 2011 which

3    ultimately led up to this, which led up to the plea agreement

4    that's before the Court.

5            And as the Court and Mr. Murray recognize, the plea

6    agreement in its own terms allows us to ask for a further

7    downward departure.  I think it is -- the relevant conduct that

8    was brought up from that second conspiracy is interesting

9    because I think it really characterizes where Mr. Morgan was

10   during the course of this conspiracy with Mr. Velasquez.

11           Once Mr. Velasquez was incarcerated in the Park County

12   Detention Center, Mr. Morgan did seek out more methamphetamine.

13   He was an addict.  What that shows is addict level behavior

14   throughout the course of the conspiracy.  And as the testimony

15   was provided to the Court throughout the course of the trial,

16   Mr. Morgan acknowledged that Mr. Velasquez actually owed him

17   money, but Mr. Morgan was willing to give him more money just

18   so he could get his fix.  He didn't have any control of the

19   purchases or any direct lines of communication to Fresno,

20   California.  He was never a member of the Fresno Bulldogs.  He

21   was simply the addict who was delivering in very small

22   quantities.  And when his source dried up due to that addict

23   level behavior, he went on and tried to find a new source.

24           I think as a character reference -- as the character

25   letters reference, this was aberrant behavior on behalf of

1   Mr. Morgan.  It was well outside of what he had previously done

2   up through his high school years.  We think that there is

3   somewhat of an overstatement of Mr. Morgan's culpability in

4   this conspiracy, placing him, as we would describe him, at an

5   addict level, not having any direct lines of communication with

6   Fresno, California, being unaware of the purchases other than

7   the boasts done by other codefendants, he was unaware of the

8   quantities that were being shipped to Sheridan, Wyoming.  He

9   had no idea of what sort of purity the methamphetamine was.  He

10  was on the lower tier of the conspiracy.  The conduct, again,

11  it just exhibits the behavior of an addict.

12          The Court is in the best position to also look at

13  Mr. Morgan's substantial assistance that he provided to the

14  Government when he was sitting there.  But it brings me back.

15  When I first walked into the courtroom today, I remember a

16  motion hearing, request for a James hearing was done, and

17  myself and Mr. Morgan and all of the rest of the codefendants

18  were sitting at this table.  At that point in time, that was in

19  the summer of 2011, but I remember something that happened

20  there.  And Mr. Morgan was as white as the Marshal's shirt when

21  it occurred.  We were under the understanding coming down to

22  this hearing that Mr. Morgan wasn't going to be outed at that

23  point.

24          And in response to one of the motions that other

25  defense counsel filed, Mr. Morgan was outed.  It designated

1    when we proffered back in January 2011.  And as that piece of

2    paper was shuffled in between the codefendants, I believe both

3    Mr. Morgan and myself were concerned for his safety as well as

4    ours.  Actually Marshals were brought in at that time.  I mean,

5    we came down to this hearing under the guise that the

6    Government was still there to protect us.  But that's when we

7    were outed.

8              It is just another key factor, I believe, through the

9    course of this long, long case of what type of assistance

10   Mr. Morgan was going to endure, that we were going to sit here

11   with other codefendants and defense counsel, knowing that we

12   were already working on a plea agreement, knowing that we

13   already proffered, and then we were outed at the last second.

14             It made for an interesting hearing, at least from our

15   perspective.  But Mr. Morgan has provided very substantial

16   assistance and pursuant to 3553 Subsection (e), the Court is

17   allowed to downward departure, and we would ask that the Court

18   would.  In my sentencing memorandum we're asking for I guess at

19   this point it would be a three-level departure at the level 29

20   which would put Mr. Morgan under the ten-year-or-under range.

21   And that's what we request.

22             For the supervised release we believe three or five

23   years is appropriate.  We think the fines should be minimal.

24   I've noticed that from the other codefendants' sentencing it

25   has kind of been a little up and down between 500 and $1,000,

1    but we would leave that to the discretion of the Court as well.

2            Your Honor, we do believe looking at the other

3    codefendants and the sentences they received, the codefendant

4    that's most like Mr. Morgan through this is Ms. Perkins,

5    Ms. Kimberly Perkins, and I believe she received something of

6    an 82-month sentence, if I remember correctly.  And that's what

7    we're really striving for here.  That's what we think is

8    appropriate for Mr. Morgan.

9            The only step Ms. Perkins took that was beyond Mr.

10   Morgan in the case, from my understanding, was wearing a wire

11   because she got wrapped up a little bit sooner than Mr. Morgan

12   did.  On the other hand, you also look at the 924(c) charges --

13   charges that were originally indicted on Mr. Morgan, and, Your

14   Honor, I think in the sentencing memorandum what we were trying

15   to explain to the Court in regards to the guns is, you know,

16   Mr. Morgan, he comes from Greybull, Wyoming, south of Greybull,

17   where he was raised in the country outside of the city limits

18   and unfortunately, firearms were part of the daily life.  I

19   don't think there was any indication through the testimony or

20   through other CIs that he ever bolstered (sic) or waved or

21   threatened anyone with the firearm.  He just happened to have

22   the firearms with him at almost all times.  Unfortunately

23   that's his way of living.  That's a lot of ways of living here

24   in Wyoming.

25           Now I'm not here to argue what Congress in regards to

1    the 924(c) charges and what purposes they are, but, you know,

2    within this district and at least under the circumstances of

3    Mr. Morgan, I think it goes above and beyond what the Congress

4    was considering when they drafted that legislation.  So, Your

5    Honor, we would ask that Mr. Morgan be sentenced to something

6    similar to Ms. Perkins as we do believe that's appropriate.

7         Mr. Morgan would like to also address the Court.  And

8    I'm not sure if that's the time to do that or if after

9    Mr. Murray has rebuttal.

10        THE COURT:  I will leave that up to you.  He can

11   address the Court now, or he can wait until the Government

12   responds.

13        MR. BEDUHN:  Your Honor, if we could have afterwards,

14   we would appreciate it.  Thank you, Your Honor.

15        THE COURT:  Thank you.

16        MR. MURRAY:  Your Honor, I have nothing further.  We

17   have asked -- we have filed our motion.  We have acknowledged

18   the -- made our recommendation in the spirit of the plea

19   agreement.  We have acknowledged that the Court can depart

20   further under the plea agreement and under the statutes and

21   really have nothing more to offer.  Thank you.

22        THE COURT:  Thank you.

23        MR. MURRAY:  I think I do have to make one comment,

24   though.  I was not present for Mr. Morgan's testimony; however,

25   all information that I have that I have received is that both

1    his testimony as well as his work with the agents was very

2    good, and he is well deserving of the substantial assistance

3    motion.

4            THE COURT:  Thank you.

5            THE DEFENDANT:  Forgive me if my voice is a little

6    shaky.  I'm pretty nervous.

7            THE COURT:  Just take your time.

8            THE DEFENDANT:  Originally I wanted just to make this

9    statement from memory, but given this is probably one of the

10   scariest, most nerve-racking days of my life, I decided it

11   would be a good idea if I just -- I wrote it all down, so here

12   it is.  I want to start off by saying that I'm sorry for

13   everything I've done, not only for my instant offenses but for

14   the bad decisions I've made during the recent years of my life.

15           I want to apologize to society, to the Court, and most

16   of all my family.  I have already been in jail for 14 months.

17   Sorry.  Excuse me.  And have been left with plenty of time to

18   reflect on the past.  Above all else, I regret the effects that

19   my thoughtless decisions have had on my family.  Words can

20   never express how much I miss them or how sad it makes me to

21   think about the upcoming years that we will be apart.

22           When law enforcement came to my house with search

23   warrants, I was overwhelmed with emotions.  I was terrified at

24   first with the whole situation that evolved around me.  Once I

25   got over the initial fear of everything, I began to think about

1   how lucky I was DCI had come to my house, terrified me and

2   found little more than paraphernalia.  I was in the grips of

3   addiction, and I had just got the help that I needed to kick my

4   habit and get my -- get back to my life.  I thought about how

5   fortunate I had been that I didn't get in any serious trouble,

6   but at the same time I had been scared straight, so to speak.

7          I moved back in with my parents and got my life back

8   on track.  I went to work for my grandfather and for his

9   fencing business and was happy and living a drug-free life.

10  All that came to an abrupt end in November of 2010.  I wasn't

11  as lucky as I first thought.  I thought that I had been treated

12  with mercy given my participation with DCI as a confidential

13  informant only to find out I was looking at potential -- at

14  potential decades in prison.  I had been federally indicted.

15  Nonetheless, I'm grateful for getting caught and getting help.

16  I needed to break the cycle.

17         I can only hope that the Court can see that I'm not a

18  bad person and that my charges greatly overstate the

19  seriousness of my conduct.  My faith and mind have been

20  renewed, and I concentrate every day on bettering myself.  I

21  have accepted the fact that the past is the past and that no

22  matter how much I would like to go back and make all the right

23  decisions, I simply can't.

24         I beg the Court to allow some measure of forgiveness

25  for the mistakes I've made and to take a look at the person I

1    am deep down when imposing its sentence today.  I am not an

2    evil person, and it is not in my nature to hurt people.  I am a

3    country boy, and I grew up spending countless time in the

4    outdoors.  I am a hunter and a fisherman.  And I can't stress

5    enough that the firearms I owned were for nothing more than an

6    average day of recreation for me and my friends.

7            I never threatened anyone with a gun, and I regret the

8    thought that anyone who knows me could ever perceive my

9    possession of them as intimidating or even relevant to drugs in

10   any way.

11           I am not a gang member, and I'm not some thug.  I know

12   the extent of my involvement, and it breaks my heart to know

13   that I am held responsible for a gang hierarchy's cumulative

14   weight of 1.5 to 5 kilograms.  I'm no doubt guilty of

15   distributing very small amounts of methamphetamine over a

16   period of time, but I feel that the relevant conduct stipulated

17   seriously overstates my involvement.

18           With all the relevant factors considered, Your Honor,

19   I feel that the adequate deterrence and rehabilitation could be

20   achieved through a much smaller sentence than ten years and

21   still acknowledge the seriousness of my offense and provide for

22   just punishment.

23           And that's all I have, Your Honor.

24           THE COURT:  Thank you.

25           MR. BEDUHN:  Your Honor, I did not help him write that

1    whatsoever.

2         THE COURT:  Thank you.  I know your family has

3    traveled yet again a long distance to be here for the

4    conclusion of this.  Mr. and Mrs. Morgan or Melissa, if you

5    have anything that you want to say, I have -- if I'm

6    remembering correctly, I believe Melissa spoke at the last

7    hearing that was continued.  But if you have anything to say,

8    please come up.  I have all the letters written on behalf of

9    friends and family members that are attached to Mr. Beduhn's

10   sentencing memorandum.

11        MS. MORGAN:  Your Honor, I can say so many things

12   about my brother.  He's really the best person that I know.

13   He's not a dangerous person.  He has a very big heart and I

14   just -- I really hope that you can see that and take that into

15   consideration.

16        THE COURT:  Thank you, Melissa.

17        MS. MORGAN:  Thank you.

18        MRS. MORGAN:  Your Honor, thank you for listening to

19   everything that everybody has good to say about Johnny.

20   Everything that's in the letters and people are saying are very

21   true.  He is a good person, and I just hope and pray that the

22   Court has mercy.  And when he does come home I will do

23   everything to support him.  He will be beside me.

24        Our family has learned a lot.  Gotten a lot wiser on

25   real bad guys.  Thank you.

1        THE COURT:  And, Mrs. Morgan, could you remind the

2   Court of your first name so we can get it correctly in the

3   record?

4        MRS. MORGAN:  I'm Lisa Renee Morgan.

5        THE COURT:  Thank you.  Yes, and I see that you

6   have -- you had written a letter to the Court as well.  So I

7   just couldn't find it in my stack of papers.

8        MR. MORGAN:  Your Honor.  I'm John Morgan, John's dad.

9   I just would like to let you know that he is a good kid, and

10  he's just made some really poor choices.  And I believe that

11  the difference between the good kid and a bad kid is a good kid

12  didn't get caught.  I know maybe that sounds crazy, but I've

13  seen it, you know, where we live.

14        And I would like to also reiterate what Nick said

15  about the guns.  You know, he's not a thug out threatening

16  people with guns.  He's had his own firearms since -- I don't

17  know.  He was probably 7 or 8 when I bought him his first .22.

18  And I believe that the firearms that he had he used for his

19  enjoyment.  And, you know, I just hope that you can see that he

20  truly is a good person.  Thank you.

21        THE COURT:  Thank you, Mr. Morgan.  Again, I

22  appreciate your traveling such a long way again for this

23  sentencing.

24        In looking at all the letters written on your behalf,

25  Johnny, you have a lot of people who love and care about you

1    and care about what happens to you.  And you are a lucky person

2    in that respect.  I am happy the Government filed a motion for

3    a downward departure so that we can address what from the

4    Court's perspective seemed to be an overly harsh sentence,

5    given the minimum mandatory sentences that have been enacted by

6    Congress.

7           Now that we are at -- now that we have the motion, we

8    are at a sentencing recommendation by the Government of 15

9    years which is noted in the plea agreement, and at this time,

10   then, the Court is left considering the substantial assistance

11   factors that are in the guidelines as opposed to the other

12   factors that can come in for consideration under request for

13   variances and other departures.

14          With the Court's change to the relevant conduct, in

15   addressing the two counts we're here to talk about today, which

16   is the drug conspiracy count and the firearms count, we have a

17   guideline recommendation of 108 to 135 months for the drug

18   conspiracy count with the Government's motion for substantial

19   assistance.  So I feel like we can look at the guideline range

20   as a reasonable range for this particular conduct.  And we are

21   at a 60-month sentence for Count 7, the gun count.

22          The Court in looking at your -- what is an appropriate

23   reduction, the Court listened to your testimony.  As Mr. Beduhn

24   noted, you testified against several individuals that had been

25   charged, and I believe your testimony was significant and

1   useful for the reasons the Government notes in its motion.  It

2   was a wilting cross-examination, and I felt like you said what

3   was the truth and you explained actions and conduct that were

4   being thrown at you, to your credit, for a man of your age.

5         It is not easy to agree to cooperate with the

6   authorities in the prosecution of others and the effect that

7   has on you and could have on you into the future.  But add to

8   that the fact that your substantial assistance was more than

9   just convincing others to plead guilty, it led to a trial of

10  coconspirators and your testimony of the conduct of

11  coconspirators.

12        I do believe that your testimony was truthful,

13  complete and was reliable to the extent that we can make a

14  reliability finding without really knowing how the jury weighed

15  credibility and witness testimony and consider all the factors

16  all the jury considers.  But from my perspective, your

17  explanation of even that phone call made sense from a mother's

18  viewpoint in terms of why you did what you did and what you

19  were intending to do and what you were not intending to do, and

20  so I would weight that significantly in your favor.

21        You certainly were involved intimately with

22  Mr. Velasquez and spoke of that and the knowledge that you had

23  as to his involvement as well as other coconspirators.  And I

24  give you a significant amount of credit for being timely in

25  your assistance.  And I remember one particular hearing where I

1    believe -- I believe it was Mr. Beduhn asked to be excused and

2    indicated that -- how you were planning on pleading and I knew

3    that -- then that you were cooperating with the Government and

4    so that assistance was timely.

5         With that, I believe it is appropriate to go beyond

6    the departure that the Government would afford on Count 1 --

7    and I will address these counts separately, and maybe I will --

8    let me address Count 7, the gun count.  I understand and

9    appreciate your explanation as well as your father's

10   explanation about the role guns and firearms have played in

11   your life.  I grew up in a hunting family as well.  However, I

12   am of the strong opinion that guns and drugs are a very, very

13   dangerous combination, and the gun count not only as to you, it

14   affects you, but your guns ended up being brought in to affect

15   or potentially affect Mr. Velasquez as well in terms of his

16   conviction of that gun count.

17        And I believe that the guns and the extent of guns in

18   the context of this drug conspiracy just simply cannot be

19   ignored or factored away or departed away.  They make a drug

20   conspiracy so much more dangerous, and I think it is

21   foreseeable that it has that effect.  Even if you felt like

22   your conduct was not meant in any way to be intimidating to

23   another person -- you to me don't seem like a very intimidating

24   person.  I believe your parents and your sister and their

25   comments about you are a young man with a good, kind heart.

1          But to have those guns brought into the -- brought

2    into this conspiracy, I think, was just so much more than a

3    mistake, and consequently, I will not depart downward on the --

4    on Count 7 on the 60-month count there.

5          As to the conspiracy count, I will afford you a

6    six-level departure downward to bring you to another 60 months.

7    And this is a, I know, a bitter pill for a young man who is

8    looking at 10 years.  I believe that that is a just disposition

9    of a case where in the dismissal of the other three counts,

10   that alone and consistent with Mr. Fun's statement and

11   consistent really with your statements in trial was a

12   significant benefit to you.  But I cannot take that additional

13   gun count away or depart downward given the amount -- the

14   number of guns that were involved and how they ended up with

15   other individuals who were more dangerous than you are.

16         So that's the explanation and overview of my

17   perspective on what is an appropriate disposition in this case.

18   Again, as a mother with children your ages, and they have

19   certainly made their own mistakes in life, it is with a deep

20   heart that I end up at this length because it is a very long

21   time for a very young man.

22         John, with that said, I will state sentence and turn

23   again to the attorneys for any correction or revision.  I guess

24   before I state sentence, perhaps the U.S. Attorney's Office

25   could help me understand the effect of any action in changing

1    the relevant conduct stipulation because there is a waiver of

2    appeal.  The way it is worded, though, it seems to -- even

3    though I went lower, one would -- could argue or perceive that

4    the waiver would be still in effect, and maybe I don't have

5    to -- I certainly don't have to resolve that, but I did want to

6    alert you to that.

7         I think I will go ahead and advise you on the

8    deadlines for filing any Notice of Appeal, and if you feel like

9    you have an appeal right, given what the Court did on relevant

10   conduct and the language in paragraph 7 of the plea agreement,

11   then you can make that argument, I guess, to the Court of

12   Appeals.

13        Any disagreement, Mr. Murray, with that?

14        MR. MURRAY:  No, Your Honor, I believe it is

15   appropriate for the Court of his right to appeal the sentence.

16        THE COURT:  All right.  Thank you.

17        Mr. Beduhn, is there any sentencing recommendation in

18   terms of placement?

19        MR. BEDUHN:  Your Honor, just two things.  Mr. Morgan

20   would like to be sentenced to Yankton.  And he recognizes it

21   might be some years before he gets there, but that would

22   provide him closeness to his family in South Dakota.

23        And the second thing I did forget to mention, and I'm

24   not sure if the Court is aware, but currently as of today

25   Mr. Morgan has 441 days credit.  Thank you, Your Honor.

1          THE COURT:   And I end up not messing around with the

2     credit.  The Bureau of Prisons will calculate that and afford

3     you credit for time within the context of your sentence.  And

4     so the sentence that I state today won't account for that

5     credit because that's administered by the Bureau of Prisons.

6          I know that Mr. Morgan's addiction embedded him in

7     this conspiracy.  I did not see or I can't remember whether

8     there was a request for consideration for RDATP.  With the gun

9     count it won't give him credit, but if there's a request for

10     consideration, I wanted to put that in the judgment if that

11     was --

12          MR. BEDUHN:   And, Your Honor, we recognize that he

13     won't receive additional credit for the time, but he would make

14     that request for the RDATP program.

15          THE COURT:   All right.  Thank you.

16          Okay.  Well, let me state sentence and then we will

17     turn for -- to Counsel for any amendments or corrections to the

18     sentence as stated.

19          Pursuant to the Sentencing Reform Act of 1984 and

20     those factors set forth in 18 USC Section 3553(e), and

21     consistent with the Government's motion pursuant to that

22     statute and Sentencing Guideline 5K1.1, it is the judgment of

23     this Court that the Defendant John Michael Morgan is hereby

24     committed to the custody of the Bureau of Prisons to be

25     imprisoned for a term of 60 months as to Count 1 and 60 months

1   as to Count 7, to be served consecutively.

2          Upon release from imprisonment, the defendant shall be

3   placed on supervised release for a term of five years as to

4   both Counts 1 and 7, to be served concurrently.

5          While on supervised release, the defendant shall

6   comply with the standard and the mandatory conditions adopted

7   by this court for supervision and shall also comply with the

8   following special conditions.

9          The defendant shall participate in and successfully

10  complete substance abuse treatment in a program approved by the

11  U.S. Probation Office and shall abide by the rules,

12  requirements and conditions of the treatment program until

13  successfully completed or until the probation office discharges

14  him from treatment.  This may include testing to determine

15  whether the defendant has reverted to the use of controlled

16  substances.

17         As a component of the defendant's treatment and

18  testing program, the defendant shall pay a one-time fee of $250

19  to partially defray the costs of treatment and/or drug testing.

20  Monetary payments made by the defendant shall be applied to

21  this fee only after all other court-ordered monetary

22  obligations are fulfilled.

23         Payment of the fee shall be made by money order or

24  cashier's check to the Clerk of the District Court, 2120

25  Capitol Avenue, Second Floor, Cheyenne, Wyoming, 82001,

1   utilizing the payment coupon provided by the U.S. Probation

2   Office.  This condition is waived in the event the defendant is

3   supervised by a district other than Wyoming.

4        The defendant shall submit to drug and alcohol testing

5   as directed by the U.S. Probation Office and shall comply with

6   specific copays imposed pursuant to district policy for failing

7   to comply with drug testing.

8        The defendant shall refrain from any use or possession

9   of alcohol and/or other intoxicants, including over-the-counter

10  medications used contrary to the recommended dosage or the

11  intentional inhalation of any substance prescribed or otherwise

12  without the permission of the probation office.  Additionally,

13  the defendant shall not enter establishments whose primary

14  income is derived from the sale of alcohol.

15       At the discretion of the U.S. Probation Officer, the

16  defendant shall participate in a cognitive behavioral treatment

17  program that may include, but is not limited to, moral

18  reconation therapy, cognitive thinking, Thinking For A Change

19  or interactive journalling.  The defendant shall actively

20  participate in treatment until successfully discharged or until

21  the U.S. Probation officer has excused the defendant from the

22  treatment regimen.

23       The defendant shall submit his person, residence,

24  office or vehicle to a search conducted by a U.S. Probation

25  officer at a reasonable time and in a reasonable manner upon

1    reasonable suspicion of contraband or evidence of a violation

2    of these conditions.  Failure to submit to a search may be

3    grounds for a revocation, and the defendant should warn all

4    other occupants that the premises may be searched pursuant to

5    this condition.

6           The Court finds the defendant does not have the

7    ability to pay a fine within the guideline range but could pay

8    a reduced fine in the amount of $400.

9           It is ordered the defendant pay a special assessment

10   of $100 per count for a total of $200 which shall be due

11   immediately.

12          The defendant shall participate in the Bureau of

13   Prisons Inmate Financial Responsibility Program to pay his fine

14   and special assessment.  All monetary payments shall be made

15   payable by cashier's check or money order to the Clerk of the

16   District Court, 2120 Capitol Avenue, Second Floor, Cheyenne,

17   Wyoming, 82001.  The defendant shall pay all financial

18   obligations immediately, and any obligations not paid

19   immediately or through the Bureau of Prisons Financial

20   Responsibility Program shall be paid beginning the month

21   following his release from confinement in monthly installments

22   of not less than $25.

23          The Court will make a strong recommendation that the

24   Bureau of Prisons give consideration to allowing Mr. Morgan to

25   participate in the 500-hour Residential Drug Abuse Program

1    administered by the Bureau of Prisons.

2          The Court will also ask for consideration by the

3    Bureau of Prisons for placement of this defendant as close as

4    possible to his family to allow for visitation, with

5    consideration being given to Yankton, South Dakota, at an

6    appropriate time consistent with this defendant's

7    classification by the Bureau of Prisons.

8          The defendant is advised that he has 14 days from the

9    date of entry of judgment to file any Notice of Appeal.

10          Is there any reason other than reasons previously

11    argued as to why the sentence should not be imposed as stated?

12          Anything from the Government?

13          MR. MURRAY:  No, Your Honor.  Thank you.

14          THE COURT:  Thank you.

15          MR. BEDUHN:  Not on behalf of Mr. Morgan.  Thank you,

16    Your Honor.

17          THE COURT:  All right.  Mr. Murray, we have the

18    remaining three counts for the Court's consideration.

19          MR. MURRAY:  Yes, Your Honor.  The Government would,

20    pursuant to the plea agreement, move for dismissal of Counts 2,

21    4 and 8 in the Indictment.

22          THE COURT:  Those counts will be dismissed consistent

23    with the Government's motion.

24          Is there anything further?

25          MR. MURRAY:  Not from the Government, Your Honor.

1    Thank you.

2            THE COURT:  Mr. Beduhn.

3            MR. BEDUHN:  No, Your Honor.  Thank you.

4            THE COURT:  Thank you.  Good luck, Johnny.

5            And good luck to you, Mr. and Mrs. Morgan.

6            Mr. Morgan, I will remand you to the custody of the

7    Marshal Service.  Again, good luck to you.  And I wish you and

8    your family the best.

9            THE DEFENDANT:  Thank you.

10            THE COURT:  This concludes the sentencing in Docket

11    10-CR-329 concerning John Michael Morgan.  The Court will stand

12    in recess until call.

13        (Sentencing proceedings concluded

14        5:05 p.m., February 6, 2012.)

15

16

17

18

19

20

21

22

23

24

25

35

1                    C E R T I F I C A T E

2

3

4

5            I, JANET DAVIS, Federal Official Court Reporter for

6    the United States District Court for the District of Wyoming, a

7    Registered Merit Reporter and Federal Certified Realtime

8    Reporter, do hereby certify that I reported by machine

9    shorthand the foregoing proceedings contained herein on the

10   aforementioned subject on the date herein set forth, and that

11   the foregoing pages constitute a full, true and correct

12   transcript.

13

14            Dated this 17th day of October, 2012.

15

16

17

18                         /s/ Janet Davis

19            _____

20                         JANET DAVIS
                     United States Court Reporter
21                   Registered Merit Reporter
                 Federal Certified Realtime Reporter
22

23

24

25